UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **CHUCK STYRON** | * | **CIVIL ACTION NO. 2:10-cv-01729** |
| | * | |
| Plaintiff, | * | **JUDGE JAMES T. TRIMBLE** |
| | * | |
| **VERSUS** | * | **MAGISTRATE JUDGE KAY** |
| | * | |
| **STATE FARM FIRE AND CASUALTY COMPANY** | * | |
| | * | |
| Defendant | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**AFFIDAVIT**</u>

**STATE OF LOUISIANA**

**PARISH OF CALCASIEU**

      **BEFORE ME,** Notary Public, on personally came and appeared **STEPHEN LAUGHLIN** who, after being duly sworn, declared that:

1.

I am a resident of Calcasieu Parish, Louisiana, and I have been a claims representative with State Farm for thirteen (13) years.

2.

On March, 20, 2009, I inspected the Styron residence, finding a structure with multiple problems, all of which were related to workmanship/improper installation, wear, tear, settlement and maintenance, except four loose shingles and four damaged and previously repaired ridge caps.

DEFENDANT'S EXHIBIT G

3.

I further made a determination that fresh water stains on the ceiling were a covered loss, but that roofing system was itself not covered because of workmanship, improper installation, wear, tear, maintenance and deterioration.

4.

I also determined that there were separate long term issues with the interior of the residence that did not arise from a covered loss, but arose from long term and continuous seepage or leakage of water resulting in rot or deterioration and which were not compensable under the subject policy. State Farm estimated that the total cost to repair/replace the loose tiles and ridge caps on Plaintiff's roof and covered interior items, tendering $2,643.44 less the applicable deductible and $143.64.

5.

Upon receipt of the Rhino Renovators estimate, State Farm representative Laughlin contacted Rhino to schedule a mutual inspection of Plaintiffs residence for the purpose of specifically addressing the items in Rhino's estimate. Each of the items contained in Rhino's estimate were addressed. During this meeting, Claims Representative Laughlin and a Representative of Rhino discussed items of damages, after which Claims Representative Laughlin made a determination that the items in the Rhino estimate were not covered under the policy issued to Plaintiff by State Farm.

6.

In an effort to make all efforts to determine if there were any additional compensable items of damage at Plaintiff's residence, State Farm retained a professional engineer, Poole

Engineering, to inspect the property and determine the cause or causes of the items of damages being claimed by Plaintiff. Based on the results of that inspection, which indicated that the additional damage for which State Farm had not tendered payment (i.e. the old water stains, and buckled floor) were not caused by Hurricane Ike.

7.

The claim was reported to State Farm claims by Plaintiff's agent on March 16, 2009; on March 19, three days later, State Farm Claims Representative Cain, a member of State Farm's Catastrophe Team, inspected the insured premises and found no hurricane damage, and referred the claim to a local claims handler; on March 20th, 2009, the very next day, Claims Representative Laughlin inspected the property and determined that damage in the amount of $2,643.44, less $143.64 in depreciation, and less Plaintiff's $2,000 deductible, was payable under the policy; payment was tendered to Plaintiff on April 8, 2009; after receiving the Rhino estimate, Claims Representative Laughlin scheduled inspection with Rhino at Plaintiff's residence for June 12, 2009; the subject residence was inspected with addressed items in Rhino's estimate on June 12, 2009; after this inspection, Claims Representative Laughlin found no additional covered items in Rhino's estimate, because of the issues with the insured residence, State Farm hired Poole Engineers, a civil structural engineer to inspect the insured residence and give an independent opinion as to the cause of the items being claimed; on August 25, 2009, State Farm received a report from Poole as to causation of items, indicating that the items being claimed by Plaintiffs were of a nature that they would not be covered under the policy issued to Plaintiff by State Farm.

SWORN TO AND SUBSCRIBED BEFORE ME, Notary Public, on this the 18th day of November, 2011 at Lake Charles, Calcasieu Parish, LA.

_____
STEPHEN LAUGHLIN

_____
NOTARY PUBLIC

Printed name of Notary: Christine B. Jernigan

Notary I.D. No. #1545

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **CHUCK STYRON** | * | **CIVIL ACTION NO. 2:10-cv-01729** |
| Plaintiff, | * | **JUDGE JAMES T. TRIMBLE** |
| **VERSUS** | * | **MAGISTRATE JUDGE KAY** |
| **STATE FARM FIRE AND CASUALTY COMPANY** | * | |
| Defendant | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF** _____

**BEFORE ME,** Notary Public, personally came and appeared **THOMAS POOLE** who, after being duly sworn, declared that:

1.

Attached hereto is a copy of my Curriculum Vita setting forth my qualifications. I am a Civil Engineer licensed to practice in the State of Louisiana. As a civil engineer, I have conducted damage assessments, including cause of loss, in approximately 150 to 200 hurricane claims in the last six years.


DEFENDANT'S EXHIBIT H

2.

In accordance with an authorization received on June 17, 2009, I conducted an investigation of the Chuck Styron & Jerry Texada property at 321 Peake St., Lake Charles, Louisiana. My investigation focused on the water stains in the ceilings throughout the house and on the buckled timber strip floor in a first floor bedroom. The results of my investigation are hereby reported with a conclusion regarding the claimed loss.

3.

The structure at 321 Peake St. in Lake Charles, Louisiana is a one and one-half story timber frame residence, supported on concrete and brick piers approximately 12" to 18" above the ground. The roofing consists of asbestos slate shingles on roofing paper. The exterior of the residence consists of wood strip siding, wooden eaves and soffits, and wooden molding. The residence is approximately 99 years old with a good portion of the original materials of construction in place.

4.

The residence includes a grassy front yard with a walkway leading to the front door, a landscaped patio/entrance on the east side, a pool and pool deck on the north side/backyard, and a shelled driveway on the west side.

5.

The purpose of this investigation is to develop an engineering opinion as to origin and cause of the water stains on the ceilings throughout the residence and the origin and cause of the buckling wood floor in the first floor bedroom. The scope of my investigation included:

    a)    Site inspection and condition survey

    b)    Photographs of scene

    c)    Engineering evaluation

    d)    Report of our findings

6.

Based on my site inspection and condition survey of June 24, 2009 and my subsequent engineering evaluation, I offer the following pertinent observations and findings:

a) There are several water stains on the ceilings of the first floor of this residence that are dark in color, and that occur at recessed lighting, around fire sprinkler heads, and at air conditioning ductwork grills. Some of the water stains in the ceilings occur in straight lines and are consistent with routing of water pipes for the sprinkler system.

b) There are several water stains on the walls of the first floor of this residence that are dark in color, and that occur at the air conditioning ductwork grills.

c) There are some water stains on the east dining room wall, just above the windows. These stains start at the intersection of the ceiling and the wall and run down the wall. These stains are also dark in color.

d) The asbestos slate shingle roof has several slate shingles missing and a few vitrified clay ridge caps out of place.

e) The drip edges for the roof are in good condition overall. However, there are localized areas where the drip edge is "buggered" or deflected away from the timber eave, leaving an un-sealed opening for rainwater to penetrate the roof.

f) The joints in the timber eaves and soffits are open due to age. These are places for rainwater to penetrate the roof.

g) The wood strip floor in the first floor bedroom, just west of the dining room is buckled. The buckled section of floor occurs just inside of the bedroom entrance.

h) The first floor structure in the immediate vicinity of the hall just off the dining room has settled and the floor is noticeably uneven.

i) Over the years, the ground surface at the perimeter of the residence has been built up by the addition of patios, landscaping, pool deck, and driveway, creating two notable conditions:

    1) A narrow band of the ground surface around the perimeter of the residence slopes toward the residence, allowing water from rain and landscaping and maintenance operations to flow under the residence.

    2) The space between the ground and the bottom of the residence has become very narrow, reducing the ability of the underside of the residence to properly vent, trapping moist air.

j)  The soils under the residence are moist and the humidity under the residence is high. The surfaces of the timber joists and beam sub-structure are coated with beads of moisture. And, the underside of the timber floor deck, and the surfaces of the timber joists and beams are water stained, which are layers of different colors.

7.

Based on the results of my investigation, the following opinions appear to be warranted:

Water stains that occur at the grills of the air conditioning in the first floor ceilings and walls of this residence are the result insufficient insulation of ducts and grills, and possibly insufficient insulation of the space between ceiling and second floor and between ceiling and attic space. Moist air in the space between the ceiling and the second floor and attic is cooled when the air conditioning unit is running. The cooled moist air in the ducts and in the space surrounding the ducts condenses, changing from a vapor state to a liquid state. The condensing moisture collects on the surfaces of the grills and duct immediately adjacent to the grill, then runs down to ceiling or wall sheetrock, causing the sheetrock to become wet. As the sheetrock dries, stains form on the ceiling or wall surfaces. The dark color of these stains is an indication that this has occurred over a long time, and the layers of color indicate that this has occurred on a repeated basis.

8.

The water stains in the first floor ceiling at the sprinkler head penetrations and the recessed lighting penetrations, and the straight line water stains between sprinkler heads are the result of insufficient insulation of the sprinkler system piping causing condensate to form on the outer surface of the piping. The cool water flowing through the water piping causes the moist air surrounding the piping to cool and the moisture to condense, changing from a vapor state to a liquid state. The condensed moisture collects along the bottom of the piping, dripping onto the ceiling sheet rock below and also running along the pipe until it gets to the sprinkler head. Also, condensate that drips from the sprinkler piping onto something else – ceiling joist, recessed light fixture, etc., follows that item to the ceiling sheetrock.

9.

The wood strip flooring of the first floor bedroom has buckled as a result of exposure to excessive moisture. The presence of excessive moisture under the residence is the result of two conditions:

a) A narrow band of ground at the perimeter of the residence slopes toward the residence. As a result, rainwater and water from landscaping or maintenance operations runs down the slope and under the residence, pooling on the saturated ground below.

b) The airspace opening between the ground and the bottom of the residence has been narrowed around the perimeter by the build-up of the ground surrounding the residence. A reduced airspace opening greatly affects the ability of the underside of the residence to properly ventilate thereby trapping moist air under the residence.

10.

Throughout the year, moisture conditions under this residence are constantly changing. During wet conditions, water runs under the residence, saturating the soil under the house and in some instances, pooling. During dry conditions, moisture in the saturated soils around the edges of the residence evaporates, with much of the water vapor becoming trapped. When the trapped water vapor begins to cool, either as a result of the changing position of the sun, or the cooling of the floor at the inner portions of the residence, the water vapor condenses, changing from a vapor state to a liquid state. The condensed water vapor collects on the surfaces of the timber sub-structure and sub-floor and is absorbed into the wood causing the sub-structure and sub-floor to become water stained and have slight surface decay.

11.

Normal construction practices require the installation of a moisture barrier between the finished flooring and the sub-floor and sub-structure. For this residence, the buckled floor in the first floor bedroom is the result of a breached moisture barrier, which has allowed water vapor to penetrate to the bottom side of the wood strips that make up the finish floor. As moisture is absorbed into the wood strips, they swell. The swelling wood grows in width, length and height. At first, the

growth takes up the small space between adjacent strips and the floor becomes tighter. As the growth continues fed by continued exposure to moisture, there is no more room to grow into the adjacent strip, so the floor buckles.

11.

The breach of the moisture barrier at this residence is the result of a combination of:

a) Normal long-term movement of the finished floor relative to the sub-floor over the life of the residence caused by temperature differentials between the finished floor and the sub-floor.

b) Normal aging of the roofing paper that forms the moisture barrier.

c) Excessive downward settlement of the sub-structure that has occurred at the hall just outside the bedroom with the buckled floor. Downward movement of the hall floor would cause the roofing paper moisture barrier to be stretched and to tear or separate.

12.

As stated in my deposition, the roof system of the house is deteriorated, and is a contributing cause to some of the interior water stains found during my inspection.

13.

Many of the water stains found on the interior of the residence existed before September 13, 2008.

SWORN TO AND SUBSCRIBED before me, Notary Public, on this the _16_ day of _November_, 2011 at _____, _____ Parish, LA.

THOMAS POOLE
DL004154706

**NOTARY PUBLIC**

Printed Name of Notary: Zoila Acosta

I.D. No. DD 811925

# PE *Poole Engineers | Consultants*
### I-ENG-A® of Southeast Louisiana

# Thomas Poole, P.E., Consulting Engineer

**Responsibility:**

Thomas Poole draws on his background as a Professional Engineer to develop and design construction documents, to conduct investigations and reports, and to conduct studies of projects. His skills stem from a variety of projects relating to construction and industrial requirements, port development and road and bridge rehabilitation and design.

Mr. Poole also designs and manages the construction of recreational parks, marine and rail car loading docks, railroad spurs, large warehouses, all utilities, structural fills, bulk handling pad, office buildings, and truck trailer loading scale.

Mr. Poole consults with clients in the chemical process, refinery, petro-chemical and pulp paper industries, as well as within the commercial development, architectural engineering, and governmental and municipal markets.

Mr. Poole conducts the dynamics of all engineering investigations. He performs fire investigations to determine the cause and origin of fires and explosions, failure of consumer products, equipment and machinery, and the cause of failures and extent of damage in residential, commercial or industrial buildings.

**Experience:**

Mr. Poole has extensive experience in civil and structural design engineering and stress analysis with a background in topographic survey, hydraulic and hydrology studies and designs, site planning layout and design, road design, bridge design, foundation design, structural design and piping design. With a total of 25 years experience in design engineering, project management, and construction management Mr. Poole has served as engineer for Port of Lake Providence, Town of Lake Providence, Town of Livingston, and City of Zachary.

Work History:
1987 - Present        Poole Engineers, Principal
1983 - 1987           Dawson Engineers, Inc., Lead Civil / Structural Engineer
1977 - 1983           Huck, Ragland & Associates, Structural Engineer

*Served from 1972-1974 in the United States Marine Corps. Honorably discharged at rank of E-4 (Corporal).*

**Education & Registration:**

1980            Bachelor of Science, Civil Engineering, Louisiana State University

1984        Registered Professional Engineer, License No. 21464

# PE Poole Engineers | Consultants
## I-ENG-A® of Southeast Louisiana

**Professional Affiliations:**

American Council of Engineering Companies
East Iberville Community Advisory Panel
Investigative Engineers Association, Inc.
Claims Support Professional Association, Inc.
Baton Rouge Claims Association
Louisiana Claims Association
National Fire Protection Association

**Expert Witness Qualifications:**

1. Structural Engineering Expert for Grant Chemical
   Arbitration proceedings:
   Merit Industrial Constructors, Inc. vs. Grant Chemical,
   - Provided report and consultation to Grant Chemical's attorney.
   - Review and comment on structural design performed by engineer of record for a process facility constructed at Grant Chemical's Zachary, LA facility.

2. Judge on Arbitration Panel, November 1999 to March 2000
   Huskey Builders, Inc. vs. Housing Authority of East Baton Rouge Parish
   - Civil/Structural Engineering Expert selected by Housing Authority of East Baton Rouge Parish to hear arguments concerning construction issues, quality of work, and payments to contractor.

3. Civil Engineering Expert for Defendant
   United States District Court, Middle District of Louisiana, Civil Action No. 04-5-D-MI
   U.S.A. vs. 8.34 Acres of Land...
   - Civil Engineering Expert – Deposition on December 5, 2004 in the offices of Poole Engineers, 2223 Quail Run Dr., Building F, Baton Rouge, LA
   - Available volume of soil in a borrow pit owned by defendant.

4. Civil/Structural Engineering Expert for Defendant
   United States District Court, Eastern District of Louisiana, Civil Acton #2:06-cv-10892
   Andrew Harris, et al versus State Farm Fire and Casualty Company
   - Gave deposition on August 21, 2007 in the law offices of McCraine, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, 3445 N. Causeway Blvd., Suite 800, Metairie, LA.
   - Storm damages resulting from hurricane Katrina

**PE** *Poole Engineers | Consultants*
**PE** **I-ENG-A**® of Southeast Louisiana

5. Civil/Structural Engineering Expert for Defendant
United States District Court, Eastern District of Louisiana, Civil Action #08-1232
Paul Cosma versus State Farm Fire and Casualty Company
- Gave deposition in offices of Beahm & Green, 145 Robert E. Lee Boulevard, Suite 402, New Orleans, LA.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **CHUCK STYRON** | * | **CIVIL ACTION NO. 2:10-cv-01729** |
| **Plaintiff,** | * | **JUDGE JAMES T. TRIMBLE** |
| **VERSUS** | * | **MAGISTRATE JUDGE KAY** |
| **STATE FARM FIRE AND CASUALTY COMPANY** | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**AFFIDAVIT**

STATE OF LOUISIANA

PARISH OF CALCASIEU

**BEFORE ME,** Notary Public, on personally came and appeared **BUZZY RIBBECK** who, after being duly sworn, declared that:

1.

I started Ribbeck Construction in 1982. Prior to 1982, I worked as a storm adjuster for GAB, during which time I adjusted losses related to at least one Hurricane. I am a licensed contractor in the states of Louisiana, Texas, Mississippi, Georgia, Alabama, Florida, North Carolina, South Carolina, Tennessee and Pennsylvania. Since 1985, I have been retained as an expert in the field of construction approximately 20 times. I have been retained by State Farm approximately 10 times to render opinions as to the cause of loss in property and casualty claims. I have been retained to other insurance companies to render opinions as to the cause of loss in



property and casualty claims. The exact number of times I have been retained by companies other than State Farm is unknown.

2.

I visited the above referenced site to provide an independent, thorough and fair evaluation to determine cause of damage related specifically to the water stained ceilings and buckled wood flooring. I made my initial site visit on July 13th 2010 with attorneys. During the visit, I climbed through the attic making my inspection and photographed exterior and interior of the dwelling.

3.

On September 23rd, I inspected the roof from above along with Ricky Poole with Poole Roofing, Inc.

4.

I made my last inspection on the interior and exterior on October 5th, 2010. On October 25th, I made my final inspection.

5.

The roof is a rigid asbestos-cement shingle roof installed over what appears to be 30 lbs. water resistant felt over ¾" solid wood sheathing. This roof shingles appear to be the original roof. This asbestos fiber and Portland cement shingle is very resistive to weather and other exposures. The shingles have a long life, however, the felt underlayment will begin to dry out and disintegrate over time and does not have as long a life as the shingles do. At some point in time, the shingles have to be removed along with the underlayment and new underlayment installed. Various studies and reports indicate that this type shingle coupled with the underlayment has a life span of about 30 years to a maximum of around 50 years depending on the location, exposure to elements and wear and tear of the roof during its life. The shingles often

2

times can be reused. Typically, economic cost of reusing the shingles plays an important part of the decision to reuse the shingle or replace with another shingle.

6.

We obtained dimensions of the structure walls and roof and produced the information on paper to assist in analyzing the relationship of the roof structure elements and leaks. We annotated the approximate areas of stains on interior ceilings on the plans. After substantial time spent inspecting both the roof systems (roofing, underlayment, siding and related flashing) and attic spaces along with our compilation drawings attached, we have concluded the following:

a) **Attic Area:** Substantial amounts of daylight are penetrating through the siding and ridge areas into the attic area. No vapor retarder or water resistant barriers are placed between the siding and the framing.

Refer to attached photos. There are PVC lines run in the attic that serviced a fire sprinkler system that I understand has been discontinued. I am not sure if the water supply to this sprinkler system has been closed off at the valve or disconnected permanently from its water source. I also am unaware if water continues to be holding in these pipes.

b) **Study Ceiling Stain:** The HVAC duct work in this location was photographed and inspected. We found that the register box that the duct is attached to is condensing and causing condensation water droplets to fall on the drywall ceiling and stain. The fiberglass insulation in the attic was removed from around the duct register as indicated on the photograph. This ceiling stain was not due to a roof leak. Refer to attached photo page numbers 1 and 2.

c) **Dining and Kitchen Ceiling Stains:** The lean to dormer roof systems over these areas (east and north dormers) are constructed of wood frame, build up roof system and wood siding. No ceiling stains were found on the 2nd floor ceiling under these roof areas. Ceiling stains were found only on the 1st floor in these rooms. The wood siding and

3

flashing are in poor condition at the base of the wall/roof intersection. The siding has begun to rot out at the roof/wall intersection (refer to photo page 27. A **substantial amount of daylight penetrating various areas from inside the attic was noted** during my inspection. We believe that wind driven rain pushed rain water up through these openings at the improper openings in the wood siding and roof/wall flashing around the dormers. The roof shingles indicated NO damage from wind or rain. Ricky Poole removed one asbestos shingle for an inspection of the underlayment. The felt underlayment is in very poor condition and is in need of replacement. The shingles have also allowed dirt to accumulate under the shingles which holds moisture and accelerates the disintegration of the felt underlayment moisture barrier. Plywood has been installed on top of the wood ceiling joist over part of the kitchen area that is accessible through a door from the stairwell. This area has been utilized for attic storage. It is difficult to see all of the ceiling from the attic as the plywood covers this area along with stored personal items. Any water that entered through the north side of the east lean to dormer wall would run down to it intersected the top side of the ceiling and would migrate above the drywall until it began to work its way through the drywall ceiling as indicated in the photographs.

d)    **Bedroom No. 2 Ceiling Stain & Floor Damage:** A bathroom is located on the south end of the $2_{nd}$ floor. No ceiling stains were found on the drywall ceilings in the $2_{nd}$ floor bathroom. Ceiling stains were found in the $1_{st}$ floor bedroom below this 2nd floor bathroom. We believe that the water that caused these stains is either from wind driven rain in or around the plumbing vent stack on the west /southwest corner of the residence or a plumbing leak/ toilet overflow or shower spray overflow that may have occurred at the $2_{nd}$ floor bathroom. If you will note on the drawings attached, the $2_{nd}$ floor bath shower is over the area of the stains on the ceiling in the bedroom below. No roof damage was found above this area.

4

e)   **Master Bedroom Ceiling Stain:** No roof damage was evident at this area.

f)   **Bedroom No. 2 Bathroom:** The stains on the ceiling of this bathroom were born from either the intersecting tie in to the flat built up roof/siding addition to the west exterior of the bathroom or from the west lean to dormer west wall. No roof damage was found. We have found no evidence of roof damage that would be caused by severe weather during any of our forensic inspections. The roofs, both asbestos shingle and built up roofs and all associated flashings are past their life cycle and are in need of replacement.

SWORN TO AND SUBSCRIBED before me, Notary Public, on this the 18th day of November, 2011 at Lake Charles, Calcasieu Parish, LA.

BUZZY RIBBECK

BEFORE ME Christine B. Jernigan
NOTARY PUBLIC
Printed Name of Notary Christine B. Jernigan
Notary I. D. No. #1545